**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**HUNTINGTON DIVISION**

**HARRY LAWRENCE QUIGLEY,**

      **Plaintiff,**

**v.**                                                                 **Case No. 3:17-cv-01906**

**CITY OF HUNTINGTON WV;**
**SHANE BILLS (in both his official and**
**personal capacity);**
**JOSEPH CICCARELLI in both his official and**
**personal capacity);**
**JOEY KOHER in both his official and**
**personal capacity);**
**JASON SMITH in both his official and**
**personal capacity); and**
**JAMES TALBERT in both his official and**
**personal capacity);**

      **Defendants.**

**PROPOSED FINDINGS AND RECOMMENDATIONS**

On March 16, 2017, Plaintiff Harry Lawrence Quigley ("Quigley"), proceeding *pro se*, filed a complaint pursuant to 42 U.S.C. § 1983. (ECF No. 2). Quigley was granted leave to amend the complaint in June 2017. (ECF Nos. 19, 23). Currently before the court are the motion and renewed motion of defendants City of Huntington, Shane Bills, and Joseph Ciccarelli to dismiss the complaint and first amended complaint. (ECF Nos. 14, 24). Plaintiff has filed a response in opposition to the motions to dismiss, (ECF No. 18), and the time for filing a reply memorandum has expired. Therefore, the motions are fully briefed and ready for resolution. The parties were also given an opportunity to argue their

positions at a motion hearing held on June 20, 2017.

This matter is assigned to the Honorable Robert C. Chambers, United States District Judge, and by standing order has been referred to the undersigned United States Magistrate Judge for the submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). For the reasons that follow, the undersigned **RECOMMENDS** that the presiding District Judge **GRANT, in part,** and **DENY, in part,** the defendants' motions, as follows: **DENY** the Motions to Dismiss of Defendants the City of Huntington and Shane Bills; **GRANT** the Motion to Dismiss of Defendant Joseph Ciccarelli, without prejudice; and **GRANT** the Motion to Dismiss any claim for injunctive relief that seeks an Order enjoining the defendants from future employment as law enforcement officers. The undersigned further **RECOMMENDS** that Defendant Ciccarelli be removed from the caption of the case and that the remaining parties be permitted to complete discovery in this civil action.

## I.    Relevant Factual Allegations

On March 17, 2016, Quigley was arrested by a City of Huntington, West Virginia police officer and was subsequently charged with the misdemeanor offense of brandishing. After spending ten days in jail and appearing three times before a county magistrate, the charge against Quigley was dismissed. Quigley now sues under 42 U.S.C. § 1983, claiming, in relevant part, that Defendants Bills, Ciccarelli, and the City of Huntington ("Huntington") violated Quigley's rights under the Fourth Amendment to the United States Constitution. The allegations most relevant to the pending motions are as follows:

In March 2016, Quigley, a 68-year old law-abiding citizen, lived at 101 Eighth Avenue in Huntington, West Virginia. When he needed groceries, Quigley routinely

walked from his residence to a Kroger supermarket located one block away. On several of these walks, Quigley interacted with a 45-year-old man, Jason David Blankenship, who lived in a home adjacent to Kroger. Quigley was cordial, but kept his interactions with Blankenship brief, because Blankenship usually appeared intoxicated.

At approximately 7:30 p.m. on Thursday, March 17, 2016, Quigley walked to Kroger to pick up some beverages to share with a friend. As he prepared to enter the store, Quigley was addressed by Blankenship, who was sitting on his front porch with two other adult males. Blankenship waved money at Quigley and asked him to buy Blankenship and his friends an 18-pack of beer. Noting that all three of the men appeared intoxicated, Quigley refused the request. The men exchanged words, then Blankenship and his two friends came down from the porch and surrounded Quigley. One of Blankenship's friends punched Quigley in the eye. In fear for his safety, Quigley pulled a straight blade knife from his pocket and pointed it at the attacker. The three men began to inch away as they looked past Quigley. Quigley turned to see what the men were looking at and saw a Cabell County deputy crouched on one knee aiming a gun at Quigley. The deputy, who was present because he routinely patrolled the Kroger parking lot, instructed Quigley to drop the knife. Quigley immediately complied.

By this time, several Huntington Police Department cruisers had arrived at the scene. Quigley was handcuffed, frisked, and ordered to sit in the back of a cruiser. Quigley saw some of the Huntington police officers speaking to Blankenship and his friends, while another Huntington police officer took a photograph of Quigley's black eye. None of the officers interviewed Quigley; instead, they began to transport him to the Huntington police station. On the way, Quigley asked the transporting officer if Blankenship and his friends were being arrested as well. The officer replied: "No, we didn't see anything." The

officer added that Blankenship had urged the Huntington police not to arrest Quigley.

Once Quigley arrived at the police station, he was fingerprinted and photographed. He was then taken before a county magistrate, who interrogated the police officer about the arrest. The officer advised the magistrate that all of the men involved in the confrontation were drunk, even though Quigley was not intoxicated. Without asking Quigley for his version of the events, the magistrate advised Quigley that he was being charged with misdemeanor brandishing and would be assigned a public defender. The magistrate set a $5000 bond, which Quigley could not afford. Ten days later, Quigley's 89-year-old aunt drove 80 miles to Huntington and posted Quigley's bond.

Quigley appeared before another county magistrate on March 30, 2016 for his preliminary hearing. Because Blankenship and his friends failed to appear, the magistrate rescheduled the hearing to May 19, 2016. On May 19, 2016, Blankenship appeared and advised the magistrate that he did not wish to proceed with the charge. Therefore, the charge was dismissed.

On June 20, 2016, Quigley visited the Huntington Police Department and requested the return of his knife, providing the clerk with a copy of the dismissal order from his criminal case. Quigley was told he would need a property release form issued by the magistrate clerk. When Quigley went to the magistrate court the following day, he was told by the magistrate clerk that the court did not issue property release forms. Quigley then wrote to Huntington's city attorney, Chief of Police Ciccarelli, the magistrate who dismissed the criminal case, the Governor of West Virginia, a state senator, a state representative, and the United States Department of Justice. However, his knife was not returned until July 10, 2017, after the initial status conference in this action.

According to Quigley, at no time before, during, or after his arrest and detention

did any arresting or investigating officer ask him for his version of the events that occurred on March 17, 2016. Quigley claims that the defendant police officers arrested him without doing a reasonable investigation and without probable cause. In addition, he claims that the police officers provided false information to the magistrate, resulting in Quigley's ten-day detention. Quigley further claims that his Fourth Amendment rights were violated by Defendant Ciccarelli, who failed to return Quigley's knife after receiving a written request. Finally, Quigley contends that Defendants Ciccarelli and Huntington are liable under § 1983 by failing to properly train and supervise the police officers and by promoting a custom, policy, and practice of ignoring federally protected civil rights.

## II.     <u>Grounds Stated in the Motion to Dismiss</u>

As previously stated, the motions to dismiss were filed on behalf of the City of Huntington, Shane Bills, and Joseph Ciccarelli. The remaining defendants have not yet been served with process and, thus, have not been required to respond to the second amended complaint. The Huntington Police Department was previously dismissed as a party by Plaintiff in the course of filing the first amended complaint. The undersigned notes that Huntington, Defendant Bills, and Defendant Ciccarelli filed their dispositive motions prior to the filing of the second amended complaint; however, to the extent the second amended complaint cures deficiencies raised by the defendants in their motions, the undersigned finds it just and judicially efficient to consider the second amended complaint in making findings and recommendations herein.

In their motions, the defendants argue that the complaint and first amended complaint should be dismissed because Quigley fails to provide factual allegations to support a conclusion that his constitutional rights were violated. Indeed, the defendants contend that there are **no** factual allegations related to any of the defendants. Instead, the

defendants are only mentioned by name in the request for relief. In addition, the defendants assert that this court lacks jurisdiction to grant a portion of the declaratory relief that Quigley requests; that being, that the defendant police officers "be enjoined and prohibited from employment in any law enforcement capacity elsewhere in the United States."

Defendants also provide a memorandum in support of the motion to dismiss in which they raise the affirmative defense of qualified immunity on behalf of Bills and Ciccarelli. Defendants acknowledge that the critical issue is whether the officers had probable cause to support their warrantless arrest of Quigley. They argue that based upon the events of March 17, 2016, as outlined by Quigley, the officers clearly had probable cause to make the arrest and acted appropriately under the circumstances. Defendants rely heavily upon Quigley's admission that the first officer on the scene witnessed Quigley holding a knife that was pointed at the other three men.[1]

## III. __Motion to Dismiss Standard__

Defendants have filed their motions to dismiss under Federal Rule of Civil Procedure 12(b)(6). Rule 12(b)(6) permits the court to dismiss a complaint that fails to state a claim upon which relief may be granted. A complaint fails to state a claim when, viewing the factual allegations as true and in the light most favorable to the plaintiff, the complaint does not contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp v. Twombly,* 550 U.S. 544, 570 (2007); *see also Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ("A claim has facial plausibility when the plaintiff pleads factual

---

[1] Defendants also argue that Quigley's due process claim should be dismissed, because he does not implicate any of the named defendants in that claim. Based upon Quigley's filings under Rule 5.1 of the Federal Rules of Civil Procedure, the undersigned believes that Quigley directs his due process claim to the State of West Virginia. Accordingly, that claim will not be addressed in this PF&R.

content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged"). The Supreme Court further explained the "plausibility" standard in *Iqbal*, stating:

> The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief."

*Iqbal,* 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557) (internal citations omitted). "Where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Iqbal,* 556 U.S. at 679. Determining whether a complaint states a facially plausible claim for relief is a "context-specific task that requires the court to draw on its judicial experience and common sense." *Id.* (citing *Iqbal v. Hasty,* 490 F.3d 143, 157–158 (2nd Cir. 2007)).

In ruling on a Rule 12(b) motion, the court must accept as true all of the factual allegations contained in the complaint. *Erickson v. Pardus,* 551 U.S. 89 (2007). In contrast, the court is not required to accept the legitimacy of legal conclusions. *Iqbal,* 556 U.S. at 678. To survive a motion to dismiss, a complaint must plead both a factual and legal basis for relief. *Id.* ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" to establish a facially plausible complaint). Courts are required to liberally construe *pro se* complaints, such as the one filed in this action. *Erickson,* 551 U.S. at 94. However, even under this less stringent standard, the complaint still must contain sufficient factual allegations to support a valid legal cause of action. *Bass v. E.I. Dupont de Nemours & Co.,* 324 F.3d 761, 765 (4th Cir. 2003). The court may not rewrite the pleading to include claims that were never

presented, *Parker v. Champion*, 148 F.3d 1219, 1222 (10th Cir. 1998); construct the plaintiff's legal arguments for him, *Small v. Endicott,* 998 F.2d 411, 417-18 (7th Cir. 1993); or "conjure up questions never squarely presented" to the court. *Beaudett v. City of Hampton,* 775 F.2d 1274, 1278 (4th Cir. 1985). A Rule 12(b)(6) motion should be granted only "'where the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory.'" *Hartmann v. Calif. Dept. of Corr. & Rehab.,* 707 F.3d 1114, 1122 (9th Cir.2013) (citing *Mendiondo v. Centinela Hosp. Med. Ctr.,* 521 F.3d 1097, 1102 (9th Cir.2008)).

## IV.    <u>Discussion</u>

Plaintiff's complaint against Defendants Bills, Ciccarelli, and the City stems from his alleged unconstitutional arrest, pretrial confinement, and prosecution. The Fourth Amendment to the United States Constitution protects the right of individuals to be free from unreasonable search and seizure. *See Manuel v. City of Joliet,* 137 S. Ct. 911, 917 (2017). This right extends from arrest to pretrial detention, both before and after the institution of legal process. *Id.* at 918-19.

In two recent decisions issued by the United States Court of Appeals for the Fourth Circuit ("Fourth Circuit"), claims of false arrest and malicious prosecution were considered. *See Smith v. Munday,* 848 F.3d 248 (4th. Cir. 2017); *Humbert v. Mayor and City Council of Baltimore City,* 866 F.3d 546 (4th Cir. 2017). The Fourth Circuit reiterated that such claims are addressed under the Fourth Amendment and to succeed on this type of Fourth Amendment claim, a plaintiff must show that "the defendant (1) caused (2) a seizure of the plaintiff pursuant to legal process unsupported by probable cause, and (3) criminal proceedings terminated in [the] plaintiff's favor." *Humbert,* 866 F.3d at 555 (quoting *Evans v. Chalmers,* 703 F.3d 636, 647 (4th Cir. 2012). In both *Humbert* and

*Smith*, the Fourth Circuit readily accepted that the plaintiff had met the first and third elements of a Fourth Amendment claim, but analyzed the second element in greater detail. Accordingly, as in this case, the pivotal issue was whether there was probable cause to support the arrest.

"Probable cause is determined by a 'totality-of-the-circumstances' approach." *Smith,* 848 F.3d at 253 (quoting *Illinois v. Gates,* 462 U.S. 213, 230 (1983)). "'While probable cause requires more than bare suspicion, it requires less than that evidence necessary to convict.'" *Id.* (quoting *United States v. Gray*, 137 F.3d 765, 769 (4th Cir. 1998)). Probable cause is an objective standard that "turns on two factors: the suspect's conduct as known to the officer, and the contours of the offense thought to be committed by that conduct." *Id.* (internal quotation marks and citation omitted). In the context of an arrest, probable cause "'means facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing the circumstances shown, that the suspect has committed … an offense.'" *Humbert,* 866 F.3d at 555 (quoting *Cahaly v. Larosa,* 796 F.3d 399, 407 (4th Cir. 2015)). The "probable-cause inquiry 'examine[s] the facts within the knowledge of the arresting officers to determine whether they provide a probability on which reasonable and prudent persons would act; [the courts] do not examine the subjective beliefs of the arresting officers to determine whether they thought that the facts constituted probable cause.'" *Smith,* 848 F.3d at 253 (quoting *Graham v. Gagnon,* 831 F.3d 176, 184 (4th Cir. 2016)). In collecting the facts to conduct the probable-cause inquiry, the arresting officer "need not 'exhaust [] every potential avenue of investigation' … [b]ut an investigating officer must still conduct some sort of investigation and assemble individualized facts that link the suspect to the crime." *Id.* at 254 (internal citation omitted).

With respect to detention on a warrantless arrest, when a suspect is brought before a neutral judge or magistrate, who makes a finding that probable cause supports the arrest of the suspect for the crime charged, the seizure is considered reasonable and, thus, does not violate the Fourth Amendment prohibition against unreasonable seizure. *Gerstein v. Pugh,* 420 U.S. 103, 114-15 (1975). Nevertheless, if the probable cause finding of the judge or magistrate is "predicated solely on a police officer's false statements ... then ... [the suspect] is confined without constitutionally adequate justification." *Manuel,* 137 S. Ct. at 918. In short, "[l]egal process has gone forward, but it has done nothing to satisfy the Fourth Amendment's probable-cause requirement." *Id.* at 918-19.

With this framework in mind, the undersigned examines the pleadings filed by Quigley to determine the sufficiency of the factual allegations against each defendant. Given Quigley's *pro se* status, the undersigned had construed the allegations liberally and has considered the additional facts and arguments contained in Quigley's Response to Defendants' Motion to Dismiss, as Quigley expressly incorporates those allegations and arguments into the second amended complaint. (ECF No. 28-1 at 9).

### A. Sufficiency of the Allegations Against Shane Bills

Quigley identifies Defendant Bills as one of the Huntington police officers that handcuffed, frisked, and arrested Quigley on March 17, 2016. Quigley asserts that the arrest was made without probable cause, because Bills failed to conduct a reasonable investigation before arresting Quigley. According to Quigley, before arresting him, Bills should have interviewed Quigley to find out what happened, instead of talking only to the three men that accosted him. Quigley contends that had Bills conducted even a minimal investigation, he would have learned that Quigley was a 68-year-old man, walking alone at dusk, while the other three younger men were spending the evening drinking on the

front porch. Bills would have learned that Quigley was on his way to Kroger and was minding his own business when he was verbally harassed and then physically surrounded by the three highly intoxicated and aggressive men. Bills would have learned that a skirmish ensued when one of the men punched Quigley in the face, without just provocation, causing Quigley to suffer a black eye. Only then did Quigley pull out a knife to protect himself, and he did not use or attempt to use knife. Before the attack could go any further, a Cabell County deputy appeared at the scene. Quigley dropped his knife immediately upon being told to do so by the deputy, and Quigley expressed great relief at the officer's presence. Quigley adds that he was not confrontational, and he fully cooperated with all of the instructions given to him by the Huntington police officers who arrived at the scene later. None of the men who instigated the assault on Quigley was injured, but all three of the men were clearly intoxicated. In contrast, Quigley alleges that he was not intoxicated, and he was the only individual at the scene to have an injury. Notwithstanding plain evidence that Quigley was the victim of an attack, rather than the perpetrator of a crime, none of the Huntington police officers ever spoke with him. Moreover, when the police officers spoke to the three instigators, at least one of them urged the police not to arrest Quigley.

Construing these allegations in the light most favorable to Quigley, the complaint states a plausible claim that Quigley was arrested without probable cause. Although Quigley had a knife, nothing about the scene, as described by Quigley, suggested that he was the aggressor. Given that Quigley was the only person injured, the facts available to Bills (as alleged by Quigley) likely would have led a reasonable and prudent police officer to suspect that Quigley was the victim, rather than the instigator, and that Quigley believed he was in imminent danger of serious bodily injury at the hands of his three

attackers when he pulled out his knife. Consequently, Quigley was not brandishing a knife "in a manner to cause or threaten a breach of the peace";[2] rather he was acting in self-defense.[3] In essence, the peace had already been breached by the three abusive and intoxicated men, and Quigley was merely acting to restore the peace. *See State v. Neal,* No. 15-0684, 2016 WL 6520222, at *4-5 (W.Va. Nov. 3, 2016) (unpublished) (holding that brandishing charge requires a breach of the peace). At a minimum, these factual circumstances arguably should have caused a reasonable and prudent officer to conduct an investigation of the readily available facts, which undoubtedly would have included asking Quigley his version of the events. *See Safar v. Tingle,* 859 F.3d 241, 246 (4th Cir. 2017) (recognizing a failure to investigate claim under § 1983, which "tests an officer's efforts to establish probable cause *before* seeking a warrant.")

Quigley also contends that his false arrest led to unnecessary detention. Rather than being given a summons to appear later, Quigley was incarcerated for ten days on a misdemeanor charge. Of note, from the facts alleged by Quigley, Defendant Bills and the other Huntington police officers who arrested Quigley did not witness any part of the

---

[2] The misdemeanor crime of brandishing is set forth in West Virginia Code § 61-7-11, which states:

> It shall be unlawful for any person armed with a firearm or other deadly weapon, whether licensed to carry same or not, to carry, brandish or use such weapon in a way or manner to cause, or threaten, a breach of the peace.

Therefore, carrying, or even brandishing a knife, is not criminal unless the act was done "in a way or manner to cause, or threaten, a breach of the peace."

[3] The elements of self-defense have been stated as follows:

> [A] defendant who is not the aggressor and has reasonable grounds to believe, and actually does believe, that he is in imminent danger of death or serious bodily harm from which he could save himself only by using deadly force against his assailant has the right to employ deadly force in order to defend himself.

*State v. Hughes,* 197 W. Va. 518, 524, 476 S.E.2d 189, 195 (1996) (quoting *State v. W.J.B.,* 166 W. Va. 602, 606, 276 S.E.2d 550, 553 (1981)).

alleged brandishing. According to Quigley, the Cabell County deputy was the only law enforcement officer who observed Quigley with the knife, and immediately ordered Quigley to drop it. (ECF No. 28-1 at 6-7). The Huntington police officers did not arrive at the scene until after Quigley had dropped the knife. West Virginia law has long provided that probable cause to make a warrantless arrest on a misdemeanor charge exists only "when the facts and circumstances within the knowledge of the arresting officer are sufficient to warrant a prudent man in believing that a misdemeanor *is being committed in his presence.*" *State v. Forsythe,* 460 S.E.2d 742, 744 (W. Va. 1995) (emphasis added); *see, also,* W. Va. Code § 62-10-6; *and State v. Lutz,* 85 W. Va. 330, 101 S.E. 434, 438 (1919) ((holding that legislation did not change the common law, which provided that "an officer had no authority to make an arrest for a misdemeanor though committed in his presence unless it involved a breach of the peace."). "For an offense to be committed in the presence of an officer, it is not necessary that all parts of the offense must be seen by the officer. S/he must be close enough at hand to be aware through some of the senses—sight, smell, hearing, etc.—that the offense *is being committed.*" *State v. Forsythe*, 460 S.E.2d 742, 745 (1995) (quoting Cleckley, *Handbook on West Virginia Criminal Procedure* I–170–71 (2nd ed. 1993) (emphasis added)). The facts, as alleged by Quigley, indicate that the *arresting* officers did not witness any part of the misdemeanor offense for which Quigley was detained.

Although it is not entirely clear from the complaint if Defendant Bills was the officer that spoke with the county magistrate, Quigley further alleges that the magistrate was given false information at the initial appearance, which made the magistrate incorrectly conclude that Quigley and the other three men were all drunk together and were equal participants in the confrontation, with Quigley being the only one to draw and

brandish a weapon. Quigley adds that Defendant Bills prepared a complaint that omitted significant facts and, thus, was fabricated and false. Quigley contends that the "false" complaint misled the magistrate as to the existence of probable cause for the brandishing charge. Based on the false and misleading information supplied by the arresting officers, the magistrate set a $5000 bond; an amount which effectively forced Quigley into confinement at the regional jail for a period of ten days. Ultimately, the charge against Quigley was dismissed when the prosecution's witness declined to testify.

In summary, while Quigley's factual allegations do not conclusively prove a Fourth Amendment violation by Defendant Bills, the undersigned **FINDS** that Quigley has alleged sufficient facts to withstand a motion to dismiss and should be permitted a reasonable opportunity to develop his case. Therefore, the Motion to Dismiss of Defendant Shane Bills should be denied.

### B. Sufficiency of the Allegations Against Joseph Ciccarelli

Quigley alleges two violations of his constitutional rights by Defendant Ciccarelli, including: (1) the failure to promptly return the knife that was confiscated from Quigley at the time of his arrest; and (2) the failure to properly train and educate Huntington police officers. (ECF No. 28-1 at 2-3). To support these claims, Quigley points to an August 2013 publication in the West Virginia Record captioned "Seventh Civil Rights Lawsuit in Past Year Filed Against Huntington Police" and Quigley's own personal experiences. (*Id.* at 3). Defendant Ciccarelli argues that these "facts" are insufficient to state a plausible claim under 42 U.S.C. § 1983.

### 1. Failure to Return Knife

Quigley concedes that Ciccarelli was not present or involved in Quigley's arrest or in the confiscation of his knife. Consequently, Quigley cannot assert a Fourth Amendment

claim against Ciccarelli for unreasonable seizure. Instead, Ciccarelli's alleged failure to return Quigley's knife after dismissal of the criminal case and after a written request for the knife's return may, at most, trigger a due process review under the Fourteenth Amendment to the United States Constitution. *See, e.g., Tinsley v. Wight*, No. CIV.A. 7:09-2455-SB, 2012 WL 5305980, at *12 (D.S.C. Mar. 28, 2012), *aff'd,* 478 Fed. Appx 15 (4th Cir. 2012) (addressing as a due process claim plaintiff's contention that a county sheriff was improperly retaining plaintiff's personal property after a wrongful seizure). To assert a plausible due process claim, Quigley must show that his deprivation was not "amenable to 'rectification by … post–deprivation state remedies.'" *Mora v. The City Of Gaithersburg, MD*, 519 F.3d 216, 231 (4th Cir. 2008); *also*, *Hudson v. Palmer*, 468 U.S. 517, 533 (1984) ("Accordingly, we hold that an unauthorized intentional deprivation of property by a state employee does not constitute a violation of the procedural requirements of the Due Process Clause of the Fourteenth Amendment if a meaningful postdeprivation remedy for the loss is available."); *and Parratt v. Taylor,* 451 U.S. 527, 541–44 (1981), *overruled in part by Daniels v. Williams,* 474 U.S. 327, 330–31 (1986). The ability to file a state court claim for conversion has been found to constitute a meaningful post-deprivation remedy. *See Kidd v. Bradley*, 578 F. Supp. 275, 276–77 (N.D.W. Va. 1984). Such a remedy is available in West Virginia. *Id.* ("Under the common law of West Virginia, '[t]he tortious or unlawful taking of personal property, and the exercise of ownership and dominion over it, against the consent of the owner is … a conversion of the property for which … [a cause of action] will lie.' The common law likewise recognizes a cause of action for the negligent deprivation of, or injury to, one's personal property rights. Inasmuch as these common law actions provide the Plaintiff at bar with an adequate post-deprivation remedy, the Court finds that the Plaintiff has not

stated a cause of action under Section 1983.") (citations omitted); *and Goodman v. Ramey*, No. CIV.A. 2:12-0439, 2012 WL 5966642, at *4 (S.D.W. Va. Nov. 29, 2012) (holding that plaintiff failed to state a constitutional claim for the loss of his property when he could have challenged the taking "in a garden-variety tort claim in state court.").

Considering that Quigley could have filed a conversion case, a due process claim against Ciccarelli must fail. Furthermore, not only is Quigley's complaint devoid of facts establishing that Ciccarelli took possession of the knife, was charged with maintaining and returning it, or was involved in the run-around Quigley experienced when he requested his knife, but Quigley now has possession of his knife. Thus, he was not permanently deprived of his property. Although the knife was returned to Quigley secondary to his federal lawsuit, he certainly could have exercised a post-deprivation state remedy. Given that an adequate post-deprivation remedy existed, and Quigley's property was returned, he cannot sustain a due process claim. Therefore, the undersigned **FINDS** that Quigley fails to state a claim against Defendant Ciccarelli based on the delayed return of Quigley's confiscated knife.

### 2. Failure to Train and Educate

As to the inadequate training and education allegation, the undersigned similarly **FINDS** that Quigley fails to state a plausible claim against Defendant Ciccarelli. Quigley complains that Ciccarelli, as Chief of Police, failed to properly train and educate the involved officers in matters of constitutional law, and this insufficient training was of such a degree "that Deliberate Indifference to Constitutional rights has been, and still is, the policy of the City of Huntington and Ciccarelli." (ECF No. 28-1 at 3).

Claims based on *respondeat superior* are not permitted under § 1983. *See Iqbal,* 556 U.S. at 676 ("Government officials may not be held liable for the unconstitutional

conduct of their subordinates under a theory of *respondeat superior.*"); *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 691 (1978) ("[A] municipality cannot be held liable *solely* because it employs a tortfeasor—or, in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory."). Nonetheless, supervisory officials may be held liable in their personal capacity for the constitutional violations of those in their charge when "supervisory indifference or tacit authorization of subordinates' misconduct [is] a causative factor in the constitutional injuries [the subordinates] inflict on those committed to their care." *Shaw v. Stroud,* 13 F.3d 791, 798 (4th Cir. 1994) (citing *Slakan v. Porter,* 737 F.2d 368, 372-73 (4th Cir. 1984)); *see also Clark v. Md. Dep't of Pub. Safety and Corr. Servs.*, 316 Fed. Appx 279, 282 (4th Cir. 2013). To state a claim under this doctrine, a plaintiff must show:

> (1) that the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed "a pervasive and unreasonable risk" of constitutional injury to citizens like the plaintiff; (2) that the supervisor's response to that knowledge was so inadequate as to show "deliberate indifference to or tacit authorization of the alleged offensive practices"; and (3) that there was an "affirmative causal link" between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff.

*Shaw*, 13 F.3d at 799. In regard to the first element, "[e]stablishing a 'pervasive' and 'unreasonable' risk of harm requires evidence that the conduct is widespread, or at least has been used on several different occasions and that the conduct engaged in by the subordinate poses an unreasonable risk of harm of constitutional injury." *Id.* "As to the second element, a plaintiff 'may establish deliberate indifference by demonstrating a supervisor's continued inaction in the face of documented widespread abuses.'" *Wilkins v. Montgomery,* 751 F.3d 214, 226-27 (4th Cir. 2014) (quoting *Shaw,* 13 F.3d at 799). Finally, "proof of causation may be direct ... where the policy commands the injury of

which the plaintiff complains ... or may be supplied by the tort principle that holds a person liable for the natural consequences of his actions." *Rauch v. W. Va. Div. of Corrections,* No. 2:13–cv-0468, 2014 WL 3732123, at \*4 (S.D.W. Va. July 25, 2014) (quoting *Wilkins,* 751 F.3d at 226-27) (citations omitted).

Here, Quigley offers insufficient facts in his complaint to satisfy all of the elements of a supervisory claim against Ciccarelli. To meet the first element, Quigley refers to the newspaper article published in August 2013, which discussed civil rights suits that had been filed against Huntington police officers in the prior year. However, Quigley does not provide any information about the lawsuits to show that they reflect widespread illegal practice. More importantly, the newspaper article was published more than a year before Ciccarelli became Huntington's Chief of Police.[4] Even if all of the cases cited by Quigley established civil rights violations by Huntington police officers, there is no factual basis to conclude that Ciccarelli had actual or constructive knowledge that his subordinates were currently engaging in conduct posing an unreasonable risk of constitutional injury to citizens like Quigley. Moreover, Quigley's complaint contains no factual allegations describing Ciccarelli's response to claims of illegal behavior by his subordinates. Indeed, other than his own personal experience, which did not directly involve Ciccarelli, Quigley has not identified any alleged constitutional violation that occurred after Defendant Ciccarelli became Chief of Police.

Even when examining the allegations against Ciccarelli in the light most beneficial to Quigley, the allegations simply do not state enough facts to raise his right to relief above

---

[4] The undersigned takes judicial notice that Joseph Ciccarelli began his duties as Huntington's Chief of Police on October 31, 2014. *See* www.wsaz.com/home/headlines/Former-FBI-Agent-and-HPD-Officer-Named -Huntington-Police -Chief.

a speculative level. To the contrary, the allegations are nothing more than labels and conclusions reached by Quigley based on his implied presumption that, as Chief of Police, Ciccarelli is responsible for the legal training and education of Huntington's police officers. To the extent Quigley intends to sue Ciccarelli in his official capacity as police chief for the municipality's alleged failure to train and educate, that claim is duplicative, as the City of Huntington has been joined in the suit on the same ground. *See Lyles v. Prawdzik*, No. PWG-15-1056, 2016 WL 3418847, at *2 (D. Md. June 22, 2016).

Quigley's sparse factual allegations against Ciccarelli, based largely on supposition and speculation, are insufficient to state a plausible case against Ciccarelli in his personal capacity. *Iqbal,* 556 U.S. at 678 (holding that a complaint "does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation."). Therefore, the undersigned **RECOMMENDS** that the complaint be dismissed against Defendant Ciccarelli. Given Quigley's *pro se* status and the fact that discovery is ongoing, the undersigned further **RECOMMENDS** that the dismissal be without prejudice to allow Quigley the opportunity to reassert his claim against Defendant Ciccarelli, in his personal capacity, should supportive facts be revealed in the future.

### C. Sufficiency of the Allegations Against the City

Quigley alleges that Huntington is liable for the police officers' alleged constitutional violations, because the officers were merely "implementing the custom, policy, and practice of the entity, the City of Huntington." (ECF No. 18 at 14). Quigley describes this custom, policy, or practice as follows:

> Arrest whoever, wherever, and however suits the arbitrary whims of the moment. Ignore federally protected rights. Ignore the right to life. Ignore the right to self-defense. Ignore due process of law. Ignore the Fourth

> Amendment and probable cause in favor of your own personal cause. Ignore the Fourth Circuit Appellate Court when it says in <u>Smith v. Munday</u> that a cop must solicit and weigh the totality-of-circumstances, and individualize facts to all parties, not merely a select few.

Quigley claims that this unconstitutional policy, custom, or practice has been longstanding in nature and implicitly ratified by the Mayor and City Council of Huntington, who represent the final policy-making authority of the municipality. (*Id.* at 19-21). To support his allegations, Quigley again relies on the August 2013 publication in the West Virginia Record, his personal experience as detailed in the complaint, and the statutory law of West Virginia, which vests the "authority, control, and discipline" of the City's police force in the hands of the municipality. (*Id.* at 21) (quoting W. Va. Code § 8-14-1, which empowers every West Virginia municipality to "protect persons and property within the municipality and preserve law and order therein, and for this purpose, to provide for, establish, equip and maintain a police force or department ... [which] shall be subject the authority, control and discipline of the administrative authority.").

'"[T]he touchstone of the § 1983 action against a government body is an allegation that the official policy is responsible for a deprivation of rights protected by the Constitution,' but local governments may also be sued 'for constitutional deprivations visited pursuant to governmental custom even though such a custom has not received formal approval through the body's official decisionmaking channels.'" *Lee v. City of S. Charleston*, No. CIV. A. 2:08-0289, 2009 WL 2602378, at *9 (S.D.W. Va. Aug. 21, 2009) (quoting *Monell,* 436 U.S. at 690-91). A municipality may be liable for a policy or custom in four ways:

> (1) through an express policy, such as written ordinance or regulation; (2) through the decisions of a person with final policymaking authority; (3) through an omission, such as a failure to properly train officers, that "manifest[s] deliberate indifference to the rights of citizens"; or (4) through

> a practice that is so "persistent and widespread" as to constitute a "custom or usage with the force of law."

*Holder v. Town of Zebulon*, Nos. 5:14-CV-18-F, 2014 WL 4416101, at *2 (E.D.N.C. Sept. 8, 2014), *aff'd,* 594 F. App'x 155 (4th Cir. 2015) (quoting *Lytle v. Doyle,* 326 F.3d 463, 471 (4th Cir.2003)). Quigley alleges a longstanding custom or practice by the Huntington Police Department to ignore Fourth Amendment rights, to make warrantless arrests without probable cause, and to otherwise run roughshod over recognized civil liberties. Therefore, Quigley's complaint "alleges a theory of custom 'by condonation.'" *Owens v. Baltimore City State's Attorneys Office*, 767 F.3d 379, 402 (4th Cir. 2014) (quoting *Spell v. McDaniel,* 824 F.2d 1380, 1390 (4th Cir.1987). "Under this theory of liability, a city violates § 1983 if municipal policymakers fail 'to put a stop to or correct a widespread pattern of unconstitutional conduct.'" *Id.* (quoting *Spell*, 824 F.2d at 1389). As the Fourth Circuit explains in *Owens,* "[p]revailing under such a theory is no easy task"; nevertheless, "simply alleging such a claim is, by definition, easier." *Id.* at 402-03. To survive a motion to dismiss, the complaint "need not be particularly detailed and the chance of success need not be particularly high"; instead, the complaint need only raise a right to relief that is plausible. *Id.* at 403.

In the complaint, Quigley identifies a municipal custom and cites to seven prior civil rights lawsuits filed against the Huntington Police Department to demonstrate the length and breadth of the alleged problem. Quigley suggests that Huntington's knowledge and indifference can be inferred from the the duration and frequency of civil rights suits. Thus, Quigley has alleged enough facts to survive a motion to dismiss. *Lee,* 2009 WL 2602378, at *3 (noting that a complaint "must provide 'fair notice of what the ... claim is and the grounds upon which it rests. ... The complaint need not, however, 'make a case'

against a defendant or even 'forecast evidence sufficient to prove an element' of the claim," but "raise a right of relief above the speculative level.'") (citations omitted).

Quigley additionally alleges that Huntington failed to properly train and educate its police officers on the subject of constitutional law. **If a municipality's failure to train its employees rises to the level of "a deliberate indifference to the rights of its inhabitants," the municipality may be held accountable under § 1983.** *City of Canton v. Harris,* 489 U.S. 378, 389 (1989). "[W]hen alleging an inadequate training policy, a complaint should contain facts revealing: (1) the nature of the training, (2) that the training was a 'deliberate or conscious' choice by the municipality, and (3) that the officer's conduct resulted from said training." *Lewis v. Simms,* No. AW–11–CV–2172, 2012 WL 254024, at *3 (D. Md. Jan.26, 2012) (quoting *Drewry v. Stevenson,* No. WDQ–09–2340, 2010 WL 93268, *4 (D. Md. Jan.6, 2010)). According to Quigley, Huntington's failure to educate its police force about constitutional and legal rights and its indifference to the consequences of that shortcoming in training are evident not only by the number of lawsuits filed against the Huntington Police Department, but also by the actions of every Huntington police officer Quigley encountered on the night of his arrest. Once again, Quigley's complaint succeeds in stating basic facts to support a plausible lack of training claim. The complaint identifies the type of training that is allegedly insufficient (training in law and constitutional rights), indicates that Huntington has long been aware of its failure to train by virtue of the multiple lawsuits alleging civil rights violations by the police force, and claims that Quigley's arrest and subsequent detention flowed directly from the lack of proper training. Thus, the undersigned **FINDS** that Quigley states enough facts to withstand the City of Huntington's motion to dismiss.

### D. Qualified Immunity

Defendants Bills and Ciccarelli contend that they are entitled to dismissal based upon the affirmative defense of qualified immunity. As the complaint fails to state a claim against Defendant Ciccarelli, the principle of qualified immunity is considered only in relation to the claims asserted against Defendant Bills.

Government officials performing discretionary functions may be protected from monetary damages under the doctrine of qualified immunity when "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982). Qualified immunity "is a judicially created doctrine that stems from the conclusion that few individuals will enter public service if such service entails the risk of personal liability for one's official decisions." *Donovan v. City of Milwaukee,* 17 F.3d 944, 947 (7th Cir. 1994). This doctrine protects law enforcement officers in the exercise of their official duties from the risk of personal liability for making "bad guesses in gray areas," ensuring that they are only responsible for "transgressing bright lines." *Marciariello v. Sumner,* 973 F.2d 295, 298 (4th Cir. 1992). As the United States Supreme Court explained in *Pearson v. Callahan:*

> Qualified immunity balances two important interests-the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably. The protection of qualified immunity applies regardless of whether the government official's error is "a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact."

*Id.,* 555 U.S. 223, 231 (2009) (quoting *Groh v. Ramirez,* 540 U.S. 551, 567 (2004)).

Because qualified immunity is "an immunity from suit rather than a mere defense to liability," it is "effectively lost if a case is erroneously permitted to go to trial." *Id.*

(quoting *Mitchell v. Forsyth,* 472 U.S. 511, 526 (1985)). "Where the defendant seeks qualified immunity, a ruling on that issue should be made early in the proceedings so that the costs and expenses of trial are avoided where the defense is dispositive." *Saucier v. Katz,* 533 U.S. 194, 200 (2001). "[A] defendant can raise the qualified-immunity defense at both the motion to dismiss and summary judgment stage." *Raub v. Bowen*, 960 F. Supp. 2d 602, 608 n.8 (E.D. Va. 2013) (citing *Tobey v. Jones,* 706 F.3d 379, 393–94 (4th Cir. 2013)). Although "a qualified immunity defense can be presented in a Rule 12(b)(6) motion ... when asserted at this early stage in the proceedings, 'the defendant faces a formidable hurdle' and 'is usually not successful." *Owens,* 767 F.3d at 396 (quoting *Field Day, LLC v. Cnty. of Suffolk,* 463 F.3d 167, 191–92 (2d Cir. 2006)). Given that the complaint need only state a *plausible* claim, and the factual allegations in the complaint are rarely conceded, factual development is usually required to resolve the issue. *Raub,* 960 F. Supp. 2d at 608 ("So long as qualified immunity does not turn on *disputed facts,* 'whether the officer's actions were reasonable is a question of pure law.'") (citing *Henry v. Purnell,* 652 F.3d 524, 531 (4th Cir. 2011)). Accordingly, in many cases, "immunity is peculiarly well-suited for resolution at the summary judgment stage." *Id.* (citing *Willingham v. Crooke,* 412 F.3d 553, 558–59 (4th Cir. 2005)).

In determining the applicability of qualified immunity, the court must consider two questions: (1) whether a constitutional or statutory right would have been violated on the facts alleged by plaintiff, and (2) whether the right asserted was clearly established at the time of the alleged violation. *Pearson,* 555 U.S. at 232. These questions may be answered in any order that "[would] best facilitate a fair and efficient disposition of each case." *Id.* at 242. If a court finds that a claimed constitutional right was not clearly established at the time of the alleged wrongdoing, the court may dispose of the case

without engaging in the pointless exercise of determining whether the facts alleged actually establish a violation of that right. *Id.* Similarly, if a court concludes that the facts alleged by the plaintiff do not support a reasonable inference that a constitutional right was violated, the analysis terminates, and the complaint is subject to dismissal for failure to state a claim.

Quigley claims that he was the subject of a warrantless arrest on a misdemeanor charge, which was not supported by probable cause. He also claims that the arresting officers provided the county magistrate with false information leading to Quigley's unlawful ten-day detention. To be reasonable, an arrest must be supported by probable cause. *Smith v. Reddy,* 101 F.3d. 351, 356 (4th Cir. 1996). Consequently, an arrest without probable cause is an unreasonable seizure. Pretrial detention without "a fair and reliable determination of probable cause" likewise amounts to an unreasonable seizure. *Manuel,* 137 S. Ct. at 917-18. An individual's right under the Fourth Amendment to be free of unreasonable seizure was clearly established in March 2016 when Quigley was arrested. *Smith*, 101 F.3d at 356. Therefore, the applicability of qualified immunity in this case is not resolved by the second question.

Looking at the first question, the undersigned concludes that the facts, as alleged by Quigley, state a *plausible* claim of a Fourth Amendment violation by Defendant Bills. Because "a fact determinative analysis on that point is not required at this stage in the litigation," the undersigned **FINDS** that the merits of Bills's qualified immunity defense is not ripe for review. *Richmond v. Dolphin,* No. 5:10-cv-01247, 2011 WL 4436636, at *3 (S.D.W. Va. Sept. 23, 2011). As stated in *Richmond,* "[t]his Court is mindful that the Supreme Court has 'stressed the importance of resolving immunity questions at the earliest possible stage in litigation." *Id.* (quoting *Hunter v. Bryant,* 502 U.S. 224, 227

(1991)). For that reason, the parties will follow a compressed scheduling order, which will allow the parties sufficient time to develop the relevant facts without unnecessarily delaying a renewed motion for dismissal on the ground of qualified immunity.

### E. Validity of Quigley's Request for Injunctive Relief

As one element of relief, Quigley asks the Court to enter an Order "that Defendants Shane Bills, Casey Williamson and Joseph Ciccarelli are, effective the date said Order is signed, enjoined and prohibited from employment in any law enforcement capacity anywhere in the United States." (ECF No. 28-1 at 13). Defendants argue that the Court lacks subject matter jurisdiction to award such relief, and, therefore, the request for relief should be dismissed. The undersigned agrees with the defendants and **FINDS** that the Court lacks jurisdiction to consider Quigley's demand for injunctive relief related to future employment of the defendants. Therefore, that claim for relief should be **DISMISSED** and stricken from the pleadings.

In order to invoke Article III jurisdiction, a plaintiff seeking injunctive relief must show an irreparable harm, a "requirement that cannot be met where there is no showing of any real or immediate threat that the plaintiff will be wronged again [in the same way]— a 'likelihood of substantial and immediate irreparable injury.'" *City of Los Angeles v. Lyons,* 461 U.S. 95, 111 (1983). The threat must be "sufficiently real and immediate to show an existing controversy." *Id.* at 103 (citation omitted). "Past exposure to the defendant[s'] allegedly illegal conduct is insufficient ... [instead] the plaintiff must show that the defendant[s'] violation as to the particular plaintiff is likely to recur. This showing 'must be premised upon more than hypothetical speculation and conjecture that harm will occur in the future.'" *Snyder v. Ocwen Loan Servicing, LLC*, No. 14 C 8461, 2017 WL 2798387, at *3 (N.D. Ill. June 28, 2017) (citations omitted).

Quigley's Fourth Amendment right to be free from unreasonable seizure may have been violated when he was arrested and detained on March 17, 2016. However, that experience does not establish the real and immediate threat that Quigley will be wrongfully arrested and detained again. *See Caviness v. Durham Pub. Sch. Bd. of Educ.*, No. 1:95CV00878, 1996 WL 33657236, at *9 (M.D.N.C. Dec. 16, 1996). Furthermore, the injunctive relief requested by Quigley is so broad and far-reaching in its application that it greatly exceeds the nature and scope of the alleged constitutional violations and seeks relief well beyond this Court's injunctive powers. Accordingly, it should be dismissed.

## V.    <u>Proposal and Recommendations</u>

For the reasons set forth above, the undersigned respectfully **PROPOSES** that the presiding District Judge accept and adopt the findings herein and respectfully **RECOMMENDS** that:

1. The Motions to Dismiss of Defendants the City of Huntington and Shane Bills, (ECF Nos. 14, 24), be **DENIED**;

2. The Motions to Dismiss of Defendant Joseph Ciccarelli**,** (ECF Nos. 14, 24), be **GRANTED,** without prejudice;

3. The Motions to Dismiss any claim for injunctive relief that seeks an order enjoining the defendants from future employment as law enforcement officers be **GRANTED**, and that claim for relief be stricken from the pleadings;

4. Defendant Ciccarelli be **REMOVED** from the caption of the case; and

5. The remaining parties be permitted to complete discovery in this action.

The parties are notified that this "Proposed Findings and Recommendations" is hereby **FILED**, and a copy will be submitted to the Honorable Robert C. Chambers, United States District Judge. Pursuant to the provisions of Title 28, United States Code,

Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure. The parties shall have fourteen days (filing of objections) and three days (if received by mail) from the date of filing this "Proposed Findings and Recommendations" within which to file with the Clerk of this Court, specific written objections, identifying the portions of the "Proposed Findings and Recommendations" to which objection is made and the basis of such objection. Extension of this time period may be granted by the presiding District Judge for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. *Snyder v. Ridenour*, 889 F.2d 1363 (4th Cir. 1989); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984). Copies of such objections shall be provided to the opposing parties, Judge Chambers and Magistrate Judge Eifert.

The Clerk is instructed to provide a copy of this "Proposed Findings and Recommendations" to the Plaintiff, counsel of record, and any unrepresented party.

**FILED:** September 22, 2017

Cheryl A. Eifert
United States Magistrate Judge